# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

KYLE A. ROBERTS,         )
                                   )

        Plaintiff,         )
                                   )

vs.                         )         Case No. 1:12-CV-134-SNLJ
                                   )

GEORGE A. LOMBARDI, et al.,   )
                                   )

        Defendants.       )

## MEMORANDUM

Currently pending in this prisoner's 42 U.S.C. § 1983 matter are several motions to dismiss the Third Amended Complaint: defendant Richard Graham's Motion to Dismiss (#83), defendant Gregory Pernoud's Motion to Dismiss (#96), defendant George Lombardi's Motion to Dismiss (#110), and defendants Corizon Health Inc. ("Corizon"), Ernest Jackson, DMD, Institutional Dental Services, P.C. ("JIDS"), Ernest Jackson, Richard Jones, and Stephanie Novak's Motion to Dismiss (#116). The motions have been fully briefed and are now ripe for disposition.

## I.     Background

Plaintiff Kyle Roberts is currently incarcerated at Potosi Correctional Center ("PCC") in Mineral Point, Missouri. Before being relocated, Roberts was an inmate at Crossroads Correctional Center ("CCC"), South Central Correctional Center ("SCCC"), and Southeast Correctional Center ("SECC").

The following facts, as taken from the complaint, are presumed true for the purpose of the pending motions to dismiss. On or around August 5, 2010, at SECC, another inmate assaulted plaintiff and broke plaintiff's jaw. Plaintiff was taken to the emergency room and treated by medical staff. His jaw was set and wired shut. After plaintiff's jaw was wired shut, he complained to the medical staff at SECC about continued jaw pain. After correctional center staff and medical center staff ignored plaintiff's complaints regarding his jaw pain, plaintiff removed the wiring from his jaw.

Plaintiff's incarceration records show he was previously diagnosed as suffering from paranoid schizophrenia, a condition that defendants, as well as the Missouri Department of Corrections, SECC, CCC, PCC, and SCC were aware of at the time of plaintiff's medical treatment.

On or around August 27, 2010, defendant dentist (and Corizon and/or JIDS employee) Dr. Jones examined plaintiff and saw that the wires had been removed. Dr. Jackson — another dentist and chief executive officer of JIDS — instructed Dr. Jones to refer plaintiff to Dr. Pernoud, an oral surgeon. Dr. Jones recommended that plaintiff's jaw be retreated, and that request was approved.

Dr. Jones, Corizon, and JIDS scheduled plaintiff's appointment with Dr. Pernoud for September 7, 2010. During this week-and-a-half delay, plaintiff alleges he was in continuous and ongoing pain and that his jaw "healed" out of alignment. On September 7, 2010, Dr. Pernoud examined plaintiff and diagnosed that his jaw was "grossly displaced"

and "in need of" oral surgery. Dr. Pernoud spoke with Dr. Jackson about the need for additional treatment and noted "decision pending."  Specifically, Dr. Pernoud reported plaintiff required "open reduction internal fixation" ("ORIF"), which requires open surgery, and"inter maxillary fixation" ("IMF"), which is a procedure for stabilizing broken bones allowing them to heal in the proper position.

Plaintiff alleges that Drs. Pernoud and Jackson deliberately delayed approving plaintiff's surgery. During this time, plaintiff's jaw continued to "heal" incorrectly and out of alignment.  Dr. Jones and Dr. Russell Graham (a medical doctor employed by Corizon who is not a defendant in this case) examined plaintiff and reviewed his medical file multiple times after September 7, 2010, each time noting they were awaiting instructions from Dr. Pernoud and Dr. Jackson regarding plaintiff's treatment. Dr. Jones and Dr. Russell Graham were aware that plaintiff needed surgery during this delay. Dr. Russell Graham's assessment on September 8, 2010, stated "Assessment[:] Mandibular fractures, w/ fragment separation – Needs ORIF."

On September 17, 2013, Dr. Russell Graham recorded that he "spoke with Dr. Jackson in the central office today. [H]e informed me that Dr. [Pernoud] will be doing the ORIF of R mandibular fx in this patient."

On October 29, 2010, Dr. Jones requested another referral to an oral surgeon stating: "Dr. [Russell] Graham has not heard from Dr. Jackson or Pernoud about what to do with [patient] concerning jaw fracture. [Patient] last saw Dr. Pernoud on 09/07/10."

The "Request Comments" dated November 1, 2010, stated, "Need more information: What are you requesting? Please call Dr. Jackson to discuss case if urgent." The referral request was denied.

Finally, on November 4, 2010, Dr. Jones spoke with Dr. Jackson about plaintiff's need for surgery. Plaintiff alleges that Dr. Jackson, Dr. Jones, and Nurse Novak agreed to prevent plaintiff from receiving needed surgery to save expense to JIDS, Corizon, and the Missouri Department of Corrections.

Dr. Jackson, with the knowledge that plaintiff is a paranoid schizophrenic, instructed Dr. Jones to speak with plaintiff and "ask if he wants further surgery or not." Dr. Jackson further instructed Dr. Jones that, if plaintiff wanted surgery, Dr. Jones was to "place referral" for the surgery, and if plaintiff did not want further surgery, Dr. Jones was to get plaintiff "to sign refusal."

At an appointment on November 5, 2010, Dr. Jones represented to plaintiff that plaintiff had to decide immediately whether he would undergo the needed surgery. The urgency confused plaintiff, and he stated that he wanted to think about the surgery. Dr. Jones refused to allow plaintiff an opportunity to evaluate his options. Plaintiff requested more time to evaluate his options. Dr. Jones then directed Nurse Novak to join the meeting and explained that plaintiff had two options: (1) surgery right then; or (2) sign a medical refusal.

Plaintiff says he made clear that he did not want to refuse surgery, and instead wanted an opportunity to consider the risks associated with surgery and evaluate whether he wanted to go through the pain of another surgery. Rather than giving plaintiff an opportunity to make an informed decision, Dr. Jones and Nurse Novak signed a refusal form over plaintiff's protest. Plaintiff never signed the refusal form. Plaintiff alleges that Dr. Jones and Nurse Novak's execution of the refusal form over plaintiff's protest precluded plaintiff from obtaining surgery.

Dr. Jackson directed Dr. Jones and Nurse Novak's actions in furtherance of JIDS's and Corizon's internal procedures, policies, standard operating procedures, and/or customs of denying inmates needed treatment for their serious medical needs in order to save money. Plaintiff alleges that Dr. Jackson specifically instructed Dr. Jones not to provide plaintiff with an opportunity to consider his options and evaluate whether he wanted to have surgery.

Plaintiff contends that defendants' denial of plaintiff's treatment was motivated by financial motives rather than addressing plaintiff's serious and painful jaw deformity. Plaintiff further believes that defendants' denial of his treatment was motivated by the fact that his behavior as a paranoid schizophrenic required his treatment be conducted with greater care and at a greater expense to defendants Corizon and JIDS.

Plaintiff says he has continued to seek treatment since then, but defendants continue to refuse. Medical staff indicated to plaintiff that surgery is still a medical possibility, yet

they have not offered the surgery or performed it. Plaintiff continued to submit medical services requests ("MSRs") to request the repair of his jaw. Dr. Jones addressed plaintiff's requests on December 3, 2010, and referred him to Dr. Jackson for a reevaluation of plaintiff's treatment options.  Dr. Jackson again referred plaintiff to Dr. Pernoud for evaluation.  Plaintiff arrived at Dr. Pernoud's office for a consult, but Dr. Pernoud refused to see plaintiff, stating he "did not want to see this offender due to the extensive procedure that needs to be done on this offender."

Plaintiff then saw defendant specialist Dr. Richard Graham on December 28, 2010, who evaluated plaintiff's jaw. Although he noted the deformity of plaintiff's jaw, he stated it "will probably resolve itself somewhat with time." Dr. Richard Graham stated that he saw no reason plaintiff needed surgery.

Plaintiff continued to file MSRs to request the surgery that Dr. Pernoud had determined was "needed" to repair plaintiff's jaw. X-ray technician Kent McNutt x-rayed plaintiff's jaw on August 16, 2011. The x-ray report noted "[t]he examination shows lucency through the right mandibular angle consistent with ununited or incompletely united fracture…fracture right mandibular angle showing incomplete bony union. CT or panorex studies may be helpful for further assessment if warranted."

To address that x-ray, plaintiff returned to Dr. Richard Graham on September 27, 2011. With the knowledge that plaintiff's jaw was "ununited or incompletely united," Dr.

Richard Graham continued to refuse surgery. When plaintiff asked Dr. Richard Graham why surgery could not be performed, Dr. Richard Graham told him "that it is not necessary and that if he will be patient, he will find that it will resolve hopefully, with time."

Plaintiff states that his painful jaw deformity did not correct itself. Records show objective signs of deformity that were observed after he was transferred to CCC on March 6, 2012. A nurse at CCC noted that plaintiff complains of "significant jaw pain, which seems to be affecting his speech." She scheduled an appointment with a physician to address his jaw pain.

Plaintiff saw Dr. Sanchez at the CCC on July 23, 2012. Dr. Sanchez ordered an x-ray of plaintiff's jaw. On September 26, 2012, after evaluating plaintiff's jaw x-ray, Dr. Sanchez saw plaintiff again. Dr. Sanchez noted that plaintiff was having "severe jaw pain" on the right side of his jaw. Dr. Sanchez stated it was best if plaintiff was referred to an oral surgeon for a follow-up. Under that entry in plaintiff's medical records, there is a record entitled "Request Comments." The comment dated September 27, 2012, stated: "What were results of [the x-ray]? What are your clinical exam findings? Please advise. Please forward [x-ray] to Dr. Jackson for review. If urgent, please call Dr. Jackson to discuss this case…." A follow-up appointment with Dr. Sanchez was scheduled on October 10, 2012, but the appointment was rescheduled because plaintiff was in administrative segregation.

Sometime on or before October 25, 2012, the Missouri Department of Corrections

transferred plaintiff to the SCCC. The "Request Comments" under Dr. Sanchez's

September 26, 2012, request then included another entry dated October 28, 2012, stating

"Unable to process, additional information not received. [Follow-up] on site and resubmit

if indicated." The record then indicates that Dr. Sanchez's referral request was denied.

Dr. Akinyede examined plaintiff on December 12, 2012, noting plaintiff

has a "deformity" and that his jaw "healed in a displaced position." Still, Dr. Akinyede

allegedly continued Corizon's, JIDS's, and MDOC's policy and/or custom of denying

needed medical treatment to save money, stating that the oral surgeon recommended

"leaving as is as risks outweigh benefits of correcting displacement."

Two weeks later, on December 26, 2012, Dr. Charles Scott evaluated plaintiff,

noting "tender R. mandibular ramus. Mouth opening seems restricted."

Plaintiff was transferred back to CCC on June 20, 2013. At CCC, Dr. John A.

Matthews prescribed pain medication to plaintiff for his continuing jaw pain on August 6,

2013. On August 22, 2013, Dr. William J. Lamanno requested yet another referral to an

oral surgeon for the following reason:

> Upon clinical exam note mandibular bone discrepancy from right to left
> side. Right side bone seems to be off line. [Patient] says jaw hurts all the
> time and he is having difficulty eating. Upon viewing the panolipse dated
> August 1, 2012 noted a lesion on the left side that needs to be clinically
> evaluated off site. Panolipse has been sent for eval. A followup pano maybe
> [sic] required to check for healing.

A note under this request asks "Per Dr. Jackson was there trauma to area? Please call him

to discuss this case." The request was again denied.

On or before September 11, 2013, MDOC transferred plaintiff to Potosi Correctional Center. Plaintiff's jaw pain continues to this day and his jaw regularly "pops" when it moves.

Plaintiff alleges that each defendant authorized or implemented a policy, practice, standard operating procedure, or custom of denying access to needed medical treatment to save money. Defendants' implementation of this policy denied plaintiff proper medical treatment causing him pain and severe emotional distress. Specially, plaintiff states that each defendant was and is personally aware of plaintiff's need for surgery but continues to deny him access to proper medical care. As a result, plaintiff says that his jaw healed improperly, causing a deformity, and he experiences continuing pain and discomfort, and he has suffered extreme mental anguish for over three years.

Plaintiff filed this lawsuit *pro se* on July 27, 2012. His initial complaint was dismissed, but he appealed and the Eighth Circuit remanded with instructions to appoint counsel. The Third Amended Complaint includes seven counts: Count I is for injunctive relief against defendants Lombardi, Dr. Jackson, JIDS, and Corizon. Count II is for violation of plaintiff's Eighth Amendment rights against all defendants. Count III is for violation of plaintiff's Fourteenth Amendment right to due process against all defendants. Count IV is for discrimination under the Americans with Disabilities Act against all defendants. Count V is for discrimination under Section 504 of the "Rehabilitation Act" against all defendants. Count VI is for intentional infliction of emotional distress against

all defendants.  Finally, Count VII is for negligent infliction of emotional distress against all defendants.

All but one defendant, Dr. Akinyede, filed motions to dismiss.  Each will be discussed in turn below.

## II.    Legal Standard

Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001) (quoting *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989)).   Although a complaint challenged by a Rule 12(b)(6) motion does not need detailed factual allegations, a petitioner must still provide the grounds for relief, and neither "labels and conclusions" nor "a formulaic recitation of the elements of a cause of action" will suffice.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  "To survive a motion to dismiss, a claim must be facially plausible, meaning that the 'factual content . . . allows the court to draw the reasonable inference that the respondent is liable for the misconduct alleged.'" *Cole v. Homier Dist. Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)). The Court must "accept the allegations contained in the complaint as true and draw all reasonable inferences in favor

of the nonmoving party." *Id*. (quoting *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)). With these principles in mind, the Court turns to the discussion.

## III.  Discussion

Each of the moving defendants' motions is discussed in turn below.

### A.  Corizon, JIDS, Dr. Jackson, Dr. Jones, and Nurse Novak's Motion to Dismiss Counts IV through VII

Corizon, JIDS, Dr. Jackson, Dr. Jones, and Nurse Novak (the "Corizon defendants") seek dismissal of Counts IV, V, VI, and VII.

#### 1.  Counts IV and V – Americans with Disabilities Act and Rehabilitation Act

Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 et seq., prohibits a "public entity" from discriminating against a "qualified individual with a disability" on account of that individual's disability. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 208 (1998).  Title II states

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  The ADA covers prisoners in state prisons because, as the Supreme Court has observed, state prisons provide prisoners with the "benefits" of "programs, services, or activities" including "recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation

in')." *Yeskey*, 524 U.S. at 210. The ADA and the Rehabilitation Act are substantially

similar, except the Rehabilitation Act adds the requirement that the "public entity" also

receive federal funding. *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 344 (8th

Cir. 2006). Therefore, cases interpreting either Act are interchangeable. *Id.* (citing

*Gorman v. Bartch*, 152 F.3d 907, 911 (8th Cir.1998)).

The Corizon defendants state they are not "public entities" and thus are not subject

to the ADA or the Rehabilitation Act. They rely upon an unpublished case from this

district that relies in turn upon a Second Circuit case, *Green v. City of New York*, 465 F.3d

65, 79 (2d Cir. 2006). Plaintiff urges this Court to distinguish *Green*, in which the court

concluded that a private hospital performing services pursuant to a contract with a

municipality was not "a creature of any governmental entity" and is a "parallel private

entity." *Id.* at 79. In that case, the hospital's contract involved receiving patients by

ambulance. *See id.* Plaintiffs maintain that the Corizon defendants are different because

they provide medical services to prisoners pursuant to the Missouri state law requiring

that the Missouri prisons provide medical care to prisoners. § 217.230 R.S.Mo. ("The

director shall arrange for necessary health care services for offenders confined in

correctional centers."). However, looking to the definition of "public entity" in the

statute, "the term 'public entity' means – (A) any State or local government; (B) any

department, agency, special purpose district, or other instrumentality of a State or States

or local government." 42 U.S.C. § 12131(1). Presumably, plaintiff would have the Court

view the Corizon defendants as "instrumentalities" of the State of Missouri. "The majority of courts—including the only circuit courts to have reached the question—have held that Title II does not apply to government contractors. These courts have employed standard canons of statutory construction to conclude that an 'instrumentality' of the government must be an entity that is either part of or created by the government itself." *Wilkins-Jones v. Cnty. of Alameda*, 859 F. Supp. 2d 1039, 1046 (N.D. Cal. 2012) (collecting cases); *but see, e.g.*, *McNally v. Prison Health Servs.*, 46 F. Supp. 2d 49, 58 (D. Me. 1999). This Court is in agreement with the prevailing view, which has been adopted in other cases in this District. *See Turner v. Mull*, 4:12-CV-561 JAR, 2014 WL 466210, --- F. Supp. 2d --- (E.D. Mo. Feb. 5, 2014); *Bounds v. Corizon, Inc.*, 4:13CV297 CDP, 2013 WL 943784, *3 (E.D. Mo. Mar. 11, 2013). Private contractors do not become instrumentalities of the state merely because they contract with the state, and thus Title II of the ADA does not impose liability on any of the Corizon defendants.

### 2.    Counts VI and VII – Infliction of Emotional Distress

In Counts VI and VII of this Third Amended Complaint, plaintiff asserts claims of intentional infliction of emotional distress and negligent infliction of emotional distress, respectively. The elements for the intentional tort are "1) defendant's conduct was extreme and outrageous, 2) defendant acted in an intentional or reckless manner, and 3) defendant's conduct resulted in severe emotional distress." *Miller v. Wackenhut Servs., Inc.*, 808 F. Supp. 697, 700 (W.D. Mo. 1992) (citing *Hendrix v. Wainright Industries*, 755

S.W.2d 411, 412 (Mo. App. E.D. 1988)). In Count VI, plaintiff alleges he "suffered a broken jaw"; "his jaw healed incorrectly, which caused physical and emotional harm;" and "the Defendants intentionally or recklessly withheld medical treatment." (#71 at 17, ¶¶ 86-88.) The factual support for those statements is reflected in the details of the complaint.

The elements required for negligent infliction of emotional distress are that (1) the defendants "realized or should have realized that their conduct involved an unreasonable risk of causing distress;" and (2) plaintiff "suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant." *Gordon v. City of Kansas City, Mo.*, 241 F.3d 997, 1004 (8th Cir. 2001). In Count VII, plaintiff alleges that defendants caused him to suffer physical and emotional distress by "denying him needed surgery to correct his jaw deformity…" and that they "realized or should have realized that their conduct involved an unreasonable risk of causing emotional distress" (*See id.*, ¶¶ 90-94.)

Defendants contend that the plaintiff is actually asserting claims for medical negligence and that the statute of limitations bars his claims. However, plaintiff has adequately pleaded claims for intentional and negligent infliction of emotional distress. The complaint does not allege the defendants were negligent in their decisions regarding treatment. Rather, it alleges that defendants decided plaintiff needed to have jaw surgery, but that they later prevented him from having the surgery, after imposing an apparently

arbitrary time limit in an alleged effort to avoid the expense of plaintiff's care. That is not a medical malpractice claim. The statute of limitations for plaintiff's stated claims is five years, § 516.120(4) RSMo, so the statute does not bar his claims.

**B.     Dr. Gregory Pernoud's Motion to Dismiss**

Plaintiff brings all seven counts except Count I against Dr. Pernoud. Dr. Pernoud seeks dismissal of Counts IV through VII.

### 1.     Counts IV and V – ADA and Rehabilitation Act

Plaintiff's ADA and Rehabilitation Act claims against defendant Pernoud fail for the same reason they fail as to the Corizon defendants. As a result, these Counts will be dismissed as to defendant Pernoud.

### 2.     Counts VI and VII – Infliction of Emotional Distress

As discussed above, plaintiff has adequately stated claims for intentional and negligent infliction of emotional distress — not a medical malpractice claim. The analysis applied to the claims against the Corizon defendants applies to the claims against defendant Pernoud. Therefore, these Counts will not be dismissed as to defendant Pernoud.

**C.     Dr. Richard Graham's Motion to Dismiss**

Dr. Richard Graham is alleged to have evaluated plaintiff's jaw twice. First, on December 28, 2010, defendant Graham noted plaintiff's jaw deformity and stated it would "probably resolve itself somewhat with time." (#70 at ¶ 39.) Defendant Graham

also said he saw no need for surgery.  (*Id.*)  Second, on September 27, 2011, defendant

Graham evaluated an x-ray from August 16. Plaintiff alleges that although Graham knew

the x-ray showed plaintiff's jaw was "ununited or incompletely united," Dr. Graham

continued to refuse surgery.  (*Id.* at ¶ 41.)  At that time, Dr. Graham told plaintiff that his

jaw issues would "resolve hopefully, with time."  (*Id.*)  Those are the only two paragraphs

in which defendant Graham is mentioned in the complaint.  Notably, although he is listed

in the case caption as a defendant, Dr. Graham is not included in the complaint's

recitation of the parties (*id*. at ¶¶ 4-12), so there are no other allegations about Dr.

Graham, the circumstances of his employment, or the nature of his treatment of plaintiff.

Dr. Graham seeks dismissal of all the Counts against him.

### 1.    **Counts II and III – Section 1983 Claims**

The first two counts against Dr. Graham are for constitutional violations

apparently brought under 42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff

must allege the violation of a right secured by the Constitution and laws of the United

States, and must show that the alleged deprivation was committed by a person acting

under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  "Public servants may

be sued under section 1983 in either their official capacity, their individual capacity, or

both." *Johnson v. Outboard Marine Corp*., 172 F.3d 531, 535 (8th Cir. 1999).  Setting

aside whether or not Dr. Graham was acting under color of state law, it appears that

plaintiff has not alleged in what capacity Dr. Graham is being sued.  Absent an express

statement that he is being sued in his individual capacity, the suit is construed as being against the defendant in his official capacity. *Id.* "A suit against a public employee in his or her official capacity is merely a suit against the public employer," and, in order to be liable for the acts of its officials, the acts must "implement or execute an unconstitutional policy or custom of the political subdivision." *Id.*

Thus, the Court construes the complaint as naming Dr. Graham in his official capacity. But, in contrast to the allegations pertaining to the other medical defendants, the complaint is completely bare of any allegations that Dr. Graham was implementing the policy or custom of denying medical care to save money. Although plaintiff frequently uses the generic term "defendants" in reference to the implementation of the custom/policy, the specific facts alleged support that certain of the defendants were so-implementing a such a custom/policy. (*See* #70 at ¶ 32.) The allegations pertaining to Dr. Graham's involvement — described above — does not suggest he was involved in the policy or custom of denying inmates treatment in order to save money. As such, the Court need not even reach whether Dr. Graham was a state actor under section 1983 because the allegations are not sufficient to state a claim against him even if he were a state actor.

### 2.    Counts IV and V – ADA and Rehabilitation Act

Plaintiff's ADA and Rehabilitation Act claims against defendant Graham fail for the same reason they fail as to the Corizon defendants and Dr. Pernoud.  As a result, these Counts will be dismissed as to defendant Graham.

### 3.    Counts VI and VII – Infliction of Emotional Distress

Dr. Graham's argument for dismissal of Counts VI and VII are the same as the above defendants' arguments.  However, Dr. Graham's motion to dismiss on those counts will be granted because, unlike allegations regarding the other medical personnel, the allegations regarding Dr. Graham's treatment do not support grouping Dr. Graham in with the other "defendants'" actions.  The other defendants were involved in the decision to allow plaintiff to have jaw surgery, but then they allegedly prevented him from having said surgery for apparently non-medical reasons.  As described above, that is not a medical malpractice claim.  The allegations against Dr. Graham, however, are that he simply determined plaintiff did not need surgery and that plaintiff should wait for his jaw to heal on its own.  Plaintiff does not connect Dr. Graham's actions to the actions that allegedly intentionally inflicted emotional distress, and thus the claim is at most a claim for medical negligence.  The two-year statute of limitations for medical negligence ran long before plaintiff's January 16, 2014 complaint named defendant Graham because Dr. Graham last saw plaintiff (according to the complaint) on September 27, 2011.  Plaintiff contends that the "continuing care exception" saves his complaint, however, it does not

appear from the face of the complaint that Dr. Graham has, in fact, provided any such

continuing care after he last saw plaintiff on September 27, 2011.  As a result, defendant

Graham's motion to dismiss shall be granted as to Counts VI and VII.

All counts against defendant Graham will therefore be dismissed without prejudice.

**D.      George Lombardi's Motion to Dismiss**

Defendant Lombardi is the director of the Missouri Department of Corrections.

The allegations against him are that he is responsible for overseeing and managing inmate

care and treatment and that he is and was aware of the policy of denying inmates needed

medical treatment to save money.  (#70 at ¶ 7.)  In addition, plaintiff alleges that

defendant Lombardi was aware of plaintiff's serious medical need no later than July 25,

2013, because that is the date defendant's attorney accepted service of the Second

Amended Complaint.  (*Id.*)  Defendant Lombardi is sued in his individual and official

capacities.  Plaintiff asserts that the pattern, practice, and/or policy of refusing and

denying medical treatment to save money was promulgated Lombardi as MDOC's

director.

Defendant Lombardi moves to dismiss all the claims against him.

**1.      Counts I,[1] II, and III --- Section 1983 Claims**

---

[1]Count I is for "Injunctive Relief," but it appears to have been brought under 42 U.S.C. §
1983 in that it refers to the defendants' "deliberate indifference" to plaintiff's serious medical
needs; therefore, the Court addresses it with the other § 1983 claims.

As stated above, to "state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West*, 487 U.S. at 48. Here, plaintiff alleges that his rights to be free of cruel and unusual punishment and his right to due process were infringed upon by defendant MDOC Director Lombardi. To state a claim under Section 1983, "plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (citing *Iqbal*, 556 U.S. at 676). Although "the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." *Jackson*, 747 F.3d at 543 (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) and *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989)). In addition, the Eighth Circuit has recently held that

> The authority of the state DOC director to make prison-wide policy decisions may be sufficient to give rise to liability under § 1983. We have found a DOC director may be "responsible for his own failure to act," based on his statutory duty to administer the Department of Corrections and "supervise the administration of all institutions, facilities and services under the Department's jurisdiction" and his authority to change the challenged policies. *Messimer v. Lockhart,* 702 F.2d 729, 732 (8th Cir.1983) (quoting Ark. Stat. Ann. § 46–105(a) (1977)). Moreover, an allegation that the DOC director authorized an unconstitutional policy may be sufficient to state a claim "for actions allegedly taken directly by" the director. *Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir.1999).

> Under Missouri law, "[t]he general supervision, management and control of
> the department of corrections shall be in the director of corrections."
> Mo.Rev.Stat. § 217.025(1) (2013). As such, [the] MDOC Director ... is
> required to "establish the duties and responsibilities of employees of the
> department" and "supervise their work assignments." Mo.Rev.Stat. §
> 217.025(3) (2013). He is "responsible for the implementation of uniform
> policies and procedures governing offenders and staff," and he must "make
> and enforce such rules, regulations, orders and findings as the director may
> deem necessary for the proper management of all correctional centers and
> persons subject to the department's control." Mo.Rev.Stat. §§ 217.025(3),
> (6) (2013).

*Jackson*, 747 F.3d at 544. Thus, it appears that the Eighth Circuit countenances an

individual-capacity § 1983 claim against a prison system director for authorizing an

unconstitutional policy or procedure in a manner that suggests respondeat superior is

allowed in some narrow way. However, plaintiff specifically disavows that he makes any

claim against Lombardi under a respondeat superior liability theory (#121 at 6), and,

instead, plaintiff insists that Lombardi was directly and personally involved in his case.

In support, plaintiff attempts to group Lombardi in with his generic allegations that

"defendants" implemented the policy/custom at issue; however, again, plaintiff has not

alleged specific facts necessary to make Lombardi's liability facially plausible. Plaintiff

attempts to tie Lombardi's liability to his receipt of the Second Amended Complaint, but

he provides no authority for such a premise. This Court is unwilling to hold that mere

receipt of an inmate's federal law suit suffices for personal knowledge and involvement

in deprivation of constitutional rights. *Cf. Prosser v. Nagaldinne*, 4:09CV2117 HEA,

2011 WL 250999, *9 (E.D. Mo. Jan. 26, 2011) (denying Director Lombardi's motion to

dismiss where plaintiff pleaded Lombardi was aware of plaintiff's inadequate care but did nothing about it).

### 2.     Counts IV - VII

Defendant Lombardi states that the ADA, Rehabilitation Act, and Infliction of Emotional Distress counts against him should be dismissed because he did not have actual knowledge of plaintiff's medical complaints and/or mental illness.  The Court agrees that these claims must fail for the same reason Counts I, II, and III fail against Lombardi, as described above.  Plaintiff contends that his complaint alleges "actions on behalf of Lombardi and [MDOC] denying Roberts needed treatment," and that "allegations against [MDOC] are also allegations against Lombardi in his official capacity."  However, MDOC is not a person, *Barket, Levy & Fine, Inc.  v.  St.  Louis Thermal Energy Corp.*, 948 F.2d 1084, 1086 (8th Cir.  1991), and MDOC and Lombardi are not interchangeable. Plaintiff simply has not alleged the specific facts necessary to make defendant Lombardi's liability facially plausible.  Thus, the claims against defendant Lombardi shall be dismissed without prejudice.

**IV.     Conclusion**

The Court will dismiss the following claims: Counts III and IV as to defendants Corizon, JIDS, Dr. Jackson, Dr. Jones, Nurse Novak, and Dr. Pernoud; all counts against defendant Graham; all counts as to defendant Lombardi.


Dated this __27th__ day of August, 2014.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE