**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

KYLE A. ROBERTS,                          )
                                          )
      **Plaintiff,**                )
                                          )
vs.                                       )          **Case No. 1:12-CV-134-SNLJ**
                                          )
GEORGE A. LOMBARDI, et al.,               )
                                          )
      **Defendants.**  )

## <u>MEMORANDUM and ORDER</u>

This matter is before the Court on defendants Corizon, LLC, Jackson Institutional

Dental Services, P.C., ("JIDS"), Dr. Ernest Jackson, Dr. Rick Jones, Stephanie Novak,

and Dr. Gregory Pernoud, D.D.S.'s motions for summary judgment (#172, #161).  The

matter has been fully briefed and is ripe for disposition.

## I.      Factual Background

The following facts are undisputed except where indicated.  Plaintiff is and was at

all relevant times an inmate with the Missouri Department of Corrections ("MDOC").

Plaintiff is a diagnosed sufferer of schizoaffective disorder, but all defendants deny

having had knowledge of that diagnosis at the time of the events pertinent to this case.

Defendant Corizon contracts with MDOC to provide medical services in Missouri

prisons.  Corizon subcontracts with defendant JIDS to provide dental services in Missouri

prisons.  Defendant Dr. Jackson is a dentist and executive director of JIDS.  Dr. Jones is

also a dentist and from August 2008 to September 2012 a contract dentist for JIDS

providing dental services to inmates at Missouri prisons.  Defendant Novak is a nurse employed by Corizon as the Health Services Administrator at Southeast Correctional Center ("SECC"), the prison where plaintiff was housed during the time relevant to the complaint.  Dr. Pernoud is an oral and maxillofacial surgeon in Festus, Missouri who is in private practice and contracts with JIDS to provide services to Missouri inmates.

On or around August 4, 2010, another inmate assaulted plaintiff and broke plaintiff's jaw.  Plaintiff was taken to the emergency room and treated by medical staff. On August 5, his jaw was set and wired shut by defendant Pernoud.  Defendant Pernoud diagnosed plaintiff with a right orbital fracture, right mandibular angle fracture, and left mandibular body fracture and performed a closed reduction, intermaxillary fixation which involved placement of wires and rubber bands between the upper and lower jaw.

Plaintiff was returned to the transitional care unit ("TCU" or infirmary) for observation at SECC and prescribed antibiotics and pain medication (Motrin 800mg every 6-8 hours).  He was also put on a liquid diet of six cans of Ensure each day and instructed not to remove the wires. Plaintiff's medical records at the prison states that, on August 6, the day after surgery, plaintiff complained of "pain to face" and requested a "shot."  Defendant Pernoud denies that this reflected plaintiff experiencing pain having to do with the wires in his jaw because it states "pain to face."  The records also state that plaintiff complained "that he felt something 'pop' and that he thinks something in his jaw, esp. the right side, came out of place," and that he is "spitting up blood."  The records confirm that plaintiff's right side of his face was slightly more swollen than the

left, and also that plaintiff was spitting "lightly-blooded" saliva into the sink. Plaintiff was seen by the prison's nursing staff and TCU physician on August 6, 9, 10, 12, 13, 16, 17, 19, 20, and 23. Plaintiff refused examination by the TCU physician on August 18. Plaintiff was examined by Dr. Jones on August 20.

Plaintiff returned to see Defendant Pernoud on August 23. Dr. Pernoud's notes reflect that plaintiff had no complaints and there were no complications. However, the prison medical records state that "nurses report he has pulled out some of his wires." Plaintiff contends that he complained to Dr. Pernoud, but his complaints were not addressed. Defendant Pernoud disputes that any wires had been removed as of August 23 and objects to the medical record statement regarding the nurses' report as hearsay.

Plaintiff removed the remainder of the wires and hardware from his jaw on or around August 27, when medical records reflect that plaintiff "has just removed more of the wiring from his mouth" and "during the evening of 8/26 [plaintiff] removed the upper arch bar from his mouth." Defendant Dr. Jones, a JIDS contract dentist, examined plaintiff on August 27 after receiving reports that plaintiff had been removing wires. Dr. Jones wrote a referral request the same day due to plaintiff's removal of the wires. The referral request was directed to Dr. Jackson of JIDS. Plaintiff states that he removed the wires to try to remedy the pain he believed was being caused by the wires. Plaintiff also points out that he suffers from schizoaffective disorder. Defendants dispute those statements and state that plaintiff removed the wires "in protest," according to plaintiff's deposition testimony. Dr. Jackson approved Dr. Jones's referral request, and, on August

30, a clerk in the medical unit contacted Dr. Pernoud's office to notify the office of the development and schedule the next appointment. Plaintiff was scheduled to see Dr. Pernoud on September 7.

Plaintiff was thereafter seen by the TCU staff on August 24, 25, 30, 31, September 2, 3, and 7. He refused examination on August 26, 27, and September 1. On September 2, plaintiff reported to Dr. Russell Graham --- a prison medical doctor --- that his jaw was feeling better aligned, and on September 3, plaintiff was engaging in clear and fluent speech (including yelling at Dr. Graham).

Plaintiff saw Dr. Pernoud again on September 7. Plaintiff testified that Dr. Pernoud said he should have been brought in sooner due to the removal of hardware. Dr. Pernoud wrote a letter to Dr. Jackson memorializing his findings and setting forth treatment options. That letter stated, in part:

> Today pt came in with IMF removed, upper arch bar removed by patient. Clinical and radiographic exam reveals the right proximal segment of the angle fx is now displaced, kicked up. Attempted manual relocation was not possible. This pt is now in need of an open reduction and internal fixation ["ORIF"] of this fracture. The approximate cost is $5495.00, not including anesthesia, which I did the first procedure under local, however he said today that he had extreme pain. Of course which he said nothing of that during the procedure, and when asked he said he was fine. The left fracture remains in good position.
>
> Other considerations are of course that this patient is non-compliant , litigious and otherwise difficult to manage. This is not my first choice for attempting a second procedure that could be risky in that he may end up with a non-union even if he does leave himself in IMF for 8 to possibly 12 weeks (since he has been open for a few days). One may consider

ORIF with plating and bone grafting with fresh edges. This would up the charges substantially, as it would be done in the hospital as with other surgeons (orthopedic). I consider the simple approach the best tx plan for this patient.

Defendant Pernoud testified that he believed plaintiff should not have further surgery in light of his previous noncompliance (i.e., removal of his hardware) and that this "wait and see" treatment option was the "simple approach" about which he wrote in the final sentence of his letter. Plaintiff argues that the letter sets out two treatment options --- (1) ORIF, or (2) ORIF with plating and bone grafting --- and that the "simple approach" must be the first ORIF discussed in the letter.

Dr. Jackson received the letter and understood that Dr. Pernoud was recommending additional surgery and that the "simple approach" meant ORIF. Dr. Pernoud admits that Dr. Jackson believed that was the case, but Dr. Pernoud denies knowing that at the time. Dr. Pernoud admits that he had a telephone conversation with Dr. Jackson about his recommendation on September 7. Plaintiff's medical records show that Dr. Pernoud informed Corizon and JIDS that he was "checking on another surgeon who does more in hospital work and would be better positioned to do the ORIF." Dr. Pernoud denies that he said that and objects to the medical record as hearsay. Dr. Pernoud's own consultation report from Setpember 7 says fracture is "kicked up" and "grossly displaced. PT is in need of ORIF replace IMF. Spoke [with] Dr. Jackson & decision pending."

On September 9, Dr. Jones evaluated plaintiff and noted that he had a displaced fracture due to his noncompliance and would need further more complicated treatment.

Further, Dr. Jones noted that he was waiting for Drs. Jackson and Pernoud to decide the next course of action. On the same day, Dr. Graham evaluated plaintiff and also noted he was awaiting the decision of Drs. Jackson and Pernoud. Dr. Graham made additional notes that he was awaiting such a decision on September 10, 13, 14, 15, and 16. On September 17, Dr. Graham noted that Dr. Jackson had informed him that Dr. Pernoud would be "doing the ORIF of R mandibular [fracture] in this patient," and Dr. Graham noted that his plan was to "await surg[ery]."

Plaintiff was discharged from the infirmary on September 21, 2010. He filed a medical services request "about jaw" on October 21 and was seen by Dr. William Dillon, a JIDS dentist, on October 26. Plaintiff filed an informal resolution request on October 26 regarding his oral health, and, on October 29, Dr. Russell Graham informed Dr. Jones he still had not heard from Drs. Jackson or Pernoud. So Dr. Jones put in a referral for plaintiff to see an oral surgeon. However, the medical records also reflect that Dr. Jackson told Dr. Jones to ask if plaintiff "wants further surgery or not" and if plaintiff "wants further surgery I am to place referral." The records state that plaintiff "wants surgery at a later date," and when he was told that was not an option, Dr. Jones and defendant Nurse Novak signed a refusal form on his behalf. Plaintiff testified that he wanted a day to think it over, rather than having to decide on the spot whether he wanted major surgery. Thus, when he was asked to sign the form acknowledging that he had refused surgery, he refused to sign it, which is why Nurse Novak signed as well. Defendants dispute that plaintiff sought another day to decide whether he wanted surgery.

6

Plaintiff filed another medical services request about his "broken jaw," which was received by medical on November 6, 2010. Plaintiff filed similar medical service requests on November 9 and December 2.[1] On December 3, plaintiff was seen by Dr. Jones, who referred plaintiff for surgery to Dr. Jackson, and Dr. Jackson referred plaintiff to Dr. Pernoud. On December 13, 2010, according to the plaintiff's medical record, plaintiff was "sent to Dr. Pernoud's office for consult" but "received phone call on 12/13/10 at 12:00 pm that Dr. Pernoud did not want to see this offender due to the extensive procedure that needs to be done on this offender." The defendants contend that Dr. Pernoud did not deny treatment, however, because they state that Dr. Pernoud did not believe treatment was needed.

Plaintiff was sent to Dr. Richard Graham,[2] an oral surgeon, for evaluation on December 28, 2010. Dr. Graham observed that plaintiff's jaw had formed an exostosis deformity where his jaw bone fragments were displaced. The medical record states that Dr. Graham saw no indication for further surgery, and Graham testified that the risks of surgery would outweigh the benefits because plaintiff's jaw had stabilized out of alignment.

Plaintiff states that he continues to suffer pain as a result of his deformed jaw. His medical records show that, even as of December 26, 2012, his jaw is tender and his mouth opening seemed restricted.

---

[1] Two medical service requests were filed December 2.
[2] Dr. Russell Graham is a medical doctor at the prison. Dr. Richard Graham is a dentist and oral surgeon who practices outside the prison.

Plaintiff filed this lawsuit, pro se, on July 27, 2012. After dismissal and a successful appeal, counsel was appointed for him. Remaining for disposition in this case are Count I for injunctive relief against Corizon, JIDS, and Dr. Jackson; Count II for violation of plaintiff's Eighth Amendment rights against Corizon, JIDS, Dr. Jackson, Dr. Jones, Nurse Novak, and Dr. Pernoud; Count III for violation of plaintiff's Fourteenth Amendment rights against Corizon, JIDS, Dr. Jackson, Dr. Jones, Nurse Novak, and Dr. Pernoud; and Counts VI and VII for intentional and negligent infliction of emotional distress, respectively, against Corizon, JIDS, Dr. Jackson, Dr. Jones, Nurse Novak, and Dr. Pernoud. All defendants have filed motions for summary judgment on all of plaintiff's remaining claims.

## II. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir.1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing that there is a genuine dispute of a material

fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324. "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Herring v. Canada Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson,* 477 U.S. at 248). A party resisting summary judgment has the burden to designate the specific facts that create a triable controversy. *See Crossley v. Georgia–Pacific Corp.,* 355 F.3d 1112, 1114 (8th Cir. 2004). Self-serving, conclusory statements without support are not sufficient to defeat summary judgment. *Armour and Co., Inc. v. Inver Grove Heights,* 2 F.3d 276, 279 (8th Cir. 1993).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). (emphasis added).

With these principles in mind, the Court turns to the discussion.

### III. Discussion

Defendants move for summary judgment on all remaining claims.

### A. Count I: Injunctive Relief

Plaintiff's Count I seeks an injunction ordering surgery to repair his improperly healed jaw. Defendants point out that three oral surgeons have agreed that plaintiff's jaw has healed and that plaintiff has a fully functioning jaw. Although it may be painful, they say that the risks of surgery now far outweigh the benefits. Plaintiff does not respond to defendants' arguments. Because there appears to be no dispute of fact regarding this point, the Court will grant summary judgment to defendants on Count I.

### B. Count II: Violation of Eighth Amendment Rights

Plaintiff claims that the defendants violated his Eighth Amendment rights when (1) they failed to address the "pop" in his jaw and pain subsequent to his surgery (Third Amended Cmplt. ¶ 71), and (2) they ignored their own conclusions that surgery was necessary and allowed plaintiff to suffer (*id.* ¶ 74).

Deliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "'Serious medical need' has been defined as a medical need which 'has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (quoting *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991); *see also Simmons v. Cook*, 154 F.3d 805, 807-08 (8th Cir. 1997) (quoting *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir.1997) ("A medical need is serious if it is

obvious to the layperson or supported by medical evidence.")). "To show deliberate indifference, [a plaintiff] must prove an objectively serious medical need and that prison officers knew of the need but deliberately disregarded it." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006).

Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct. *Olson v. Bloomberg*, 339 F.3d 730, 736 (8th Cir. 2003). Rather, the subjective inquiry must show disregard of "a known risk to the inmate's health." *Gordon*, 454 F.3d at 862 (citing *Olson*, 339 F.3d at 736). "Knowledge of risk may be inferred from the record." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). "Whether a prison's medical staff deliberately disregarded the needs of an inmate is a fact-intensive inquiry." *Nelson v. Shuffman*, 603 F.3d 439, 448 (8th Cir. 2010). "The inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Nelson*, 603 F.3d at 448.

Further, an inmate alleging constitutionally inadequate medical care due to delay in medical care must show both that (1) the deprivation alleged was objectively serious; and (2) the defendant knew of the medical need but was deliberately indifferent to it. *Grayson v. Ross*, 454 F.3d 802, 808–09 (8th Cir. 2006); *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir.2005). "Intentional delay in providing medical treatment shows deliberate disregard if a reasonable person would know that the inmate requires medical attention or the actions of the officers are so dangerous that a knowledge of the risk may be presumed." *Gordon*, 454 F.3d at 862 (citing *Plemmons v. Roberts*, 439 F.3d 818, 823 (8th Cir. 2006)). When an "inmate alleges that a delay in medical treatment rises to the

level of an Eighth Amendment violation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'" *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005). "To establish this effect, the inmate 'must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997).

There is no dispute that plaintiff's broken jaw constituted a serious medical need. Plaintiff received initial treatment for that broken jaw. Later, however, plaintiff apparently experienced pain that he believed was not being addressed, and he removed the hardware that had been needed for his jaw to heal properly. Plaintiff contends that the defendants' failure to treat his jaw at that point demonstrates deliberate indifference to a serious medical need.

### 1. Corizon and JIDS

When an agency is named as a defendant in a § 1983 claim, the plaintiff must establish that the alleged unconstitutional action is based on an implemented or executed policy, regulation, or decision adopted by and promulgated by the agency. *Monell v. Dept. of Social Svs. of City of New York*, 436 U.S. 658, 690 (1978).

Here, plaintiff argues that Corizon and JIDS have developed a policy by which a patient gets trapped in a cycle of referral requests and referrals, and there is nothing in place to ensure that a patient actually receives needed treatment. In turn, plaintiff contends, Corizon saves the expense of the treatment.[3] Specifically, according to

---

[3] It appears undisputed that Corizon is paid a set amount of money, per inmate, per day, regardless of that inmate's medical needs.

Corizon's own facts, when an inmate presents with dental needs outside the scope of the treating dentist's expertise, the dentist submits a referral request for specialized care. That request is reviewed by Dr. Jackson. If the request meets criteria for outside evaluation, Dr. Jackson approves the request and an appointment is made. After a referral is made, the outside specialist reports findings to Dr. Jackson. Dr. Jackson then determines what treatment, if any, is needed, based on the recommendations and expertise of the specialist. The policy does not require that anyone follow up with a specialist to determine when treatment will occur. If a patient is not satisfied with the treatment they are receiving, they can submit medical service requests or initiate the grievance process; however, plaintiff asserts that those requests and grievances are not afforded an outside review or evaluation. The grievance appeals, for example, are reviewed by the same person who originally made the determination objected to by the patient/prisoner.

Plaintiff refers to this as a "circular system" that keeps the patient trapped in administrative red tape. Dr. Jackson --- the chief executive for JIDS --- knew Dr. Pernoud's opinion that plaintiff was "in need of" surgery, but plaintiff contends he did nothing to ensure plaintiff received that surgery. Indeed, other than denying that Dr. Pernoud advised surgery at all (which will be discussed below), the individuals involved in ensuring plaintiff's care did nothing at all to ensure plaintiff received that care. Plaintiff maintains that as a result of the policies in place by Corizon and JIDS, plaintiff's jaw healed in a displaced position and causes him continued pain.

Defendants respond that, each time a referral request was made, a referral promptly resulted. The breakdown here appears to have occurred after Dr. Pernoud made his recommendation --- even Dr. Pernoud's notes say that a decision (from Dr. Jackson) was pending --- but the repeated notes in plaintiff's medical record reflect an utter lack of follow-up within the agencies. For example, as of October 29, 2010, nearly two months after plaintiff's September 7 appointment with Pernoud, and despite numerous treatment notes reflecting various communications among the dentists and physicians, the treating dentist and doctor at the jail still had not heard from Drs. Jackson or Pernoud regarding the treatment plan. In fact, plaintiff did not actually see a specialist again until the end of December.

However, the policy itself was not the cause of the problems. Instead, the cause was the alleged failure of Drs. Pernoud and Jackson to take action under the policy. Indeed, the policy directs that a decision be made, and plaintiff's recourse is against those who did not follow the policy. Although plaintiff complains that the policy does not require that Dr. Jackson or anyone else follow up with a specialist to determine when treatment will occur, that follow-up is implicit within the requirement that a decision be made. For these reasons, the policy itself does not amount to deliberate indifference. Summary judgment will be granted to defendants Corizon and JIDS.

### 2.    Dr. Pernoud

With respect to Dr. Pernoud's actions, plaintiff testified that Dr. Pernoud was dismayed that plaintiff had not been brought in sooner to address his self-removed

hardware. Dr. Pernoud then spoke with Dr. Jackson and wrote a letter outlining plaintiff's diagnosis and stating plaintiff "is now in need of an open reduction and internal fixation of this fracture." Dr. Pernoud goes on to state the treatment will cost $5,495, not including anesthesia. Then Dr. Pernoud states "other considerations" including that the plaintiff is "non-compliant, litigious, and otherwise difficult to manage." His next sentence is "This is not my first choice for attempting a second procedure that could be risky…". And he suggests "One may consider ORIF with plating and bone grafting," but it would be more costly and "be done in the hospital as with other surgeons (orthopedic)" [sic]. He concludes by saying "I consider the simple approach the best [treatment] plan for this patient."

There is a disputed issue of fact regarding Dr. Pernoud's intentions. The doctors who followed up with plaintiff believed Pernoud intended to perform additional surgery. Dr. Jackson, the doctor with whom Dr. Pernoud spoke on the phone on the same day Pernoud wrote the letter, believed additional surgery would be performed. Although Pernoud denies it, medical records suggest that Pernoud had told the other doctors that he was looking into other surgeons who would perform the (perhaps more difficult) surgery. Dr. Pernoud, however, is adamant that he never intended to operate again on plaintiff --- and he did not believe plaintiff needed further surgery --- and that, instead, the "simple approach" was the "wait and see" approach. That is, Dr. Pernoud has testified he intended to wait and see whether plaintiff's jaw healed itself.

Dr. Pernoud's explanation, however, stands in contrast to both his consultation report and his letter, which did not mention that doing nothing at all was an option. Indeed, the consultation report stated only that plaintiff need ORIF and that a decision

from Dr. Jackson was "pending." Furthermore, Dr. Jackson's understanding of Dr. Pernoud's plan does not support Dr. Pernoud's story. In addition, the record shows that, when plaintiff attempted to see Dr. Pernoud again (three months later), Dr. Pernoud stated that he did not want to see plaintiff due to the "extensive procedure that needs to be done."

In addition, there is a dispute regarding whether Dr. Pernoud should have noticed that plaintiff had already removed the wires from his jaw as of the August 23 appointment. Plaintiff also disputes that he reported no problems at that appointment.

Ultimately, plaintiff contends Dr. Pernoud is not entitled to summary judgment because Pernoud recognized the need for additional jaw surgery but then --- rather than follow up as he indicated he would --- there is evidence he avoided plaintiff and plaintiff's caregivers until plaintiff's jaw healed out of alignment. There is a genuine dispute of fact regarding what occurred both before and after plaintiff's September 7 visit with Dr. Pernoud. The Eighth Circuit has reversed summary judgment granted to caregivers who failed to provide "prompt treatment, i.e., corrective surgery" to a prisoner with a broken jaw. *Wise v. Lappin*, 674 F.3d 939, 941 (8th Cir. 2012). Dr. Pernoud's argument appears to rest on his position that he recommended against further treatment from the beginning.[4] However, the record shows a genuine dispute regarding that issue. Dr. Pernoud also contends that plaintiff had a "satisfactory" or "excellent" result (*see* #190 at 10) and that plaintiff was given the opportunity to see a second oral surgeon, but that was not until December 2010, by which time the jaw had healed out of alignment. As for plaintiff's result, even the defendant's expert Dr. Hosch admits that plaintiff's jaw

---

[4] Notably, Dr. Pernoud's reply memorandum (#190) does not address the Eighth Circuit law regarding failure to treat jaw deformities.

is deformed and that it could be painful; indeed, plaintiff's medical records show that his continued jaw pain made eating and speaking painful well after his jaw injury healed out of alignment.

The Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish. *See Jenkins v. City of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009). However, under these facts, there is a genuine dispute regarding whether Dr. Pernoud was deliberately indifferent to plaintiff's displaced jaw.

Finally, Dr. Pernoud cannot rely on qualified immunity. "Qualified immunity may protect government officials from liability under 42 U.S.C. § 1983, but not if their conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 527 (8th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "The unlawfulness of the action 'must merely be apparent in light of preexisting law.'" *Ellis v. Houston*, 742 F.3d 307, 325 (8th Cir. 2014) (quoting *Nelson*, 583 F.3d at 531). Defendant Pernoud maintains that plaintiff has failed to allege any act or omission that violated plaintiff's constitutional rights. However, defendant Pernoud bases that argument on his position that his proposed treatment plan was to "wait and see" whether plaintiff's jaw would heal on its own. Because there is a disputed issue of fact on that point, the Court cannot grant summary judgment to Dr. Pernoud.

### 3. Dr. Jackson

Plaintiff claims that Dr. Jackson delayed and obstructed his access to medical care for his jaw. Dr. Jackson contends he is entitled to summary judgment because he acted quickly to make referrals to specialists. It does appear that Dr. Jackson responded

promptly to Dr. Jones's request for a referral upon discovering plaintiff had removed his hardware. However, the alleged deliberate indifference to plaintiff's serious medical need occurred after September 7. No referrals were made between September 7 and December 3, 2010. The medical records show that, as late as September 17, Dr. Jackson told Dr. Graham that Dr. Pernoud would be doing the ORIF, so Dr. Graham wrote that he was awaiting surgery orders. As of October 29, 2010, Drs. Graham and Jones were still waiting to hear back from Dr. Jackson. Dr. Jackson argues that the other doctors were mistaken and that no surgery had been indicated, but that stands in contrast to Dr. Jackson's decision to offer plaintiff another referral to Dr. Pernoud on November 4 and his eventual decision to send plaintiff on an aborted mission to see Dr. Pernoud on December 13. Another two weeks then passed before plaintiff actually saw a specialist, Dr. Richard Graham, on December 28. Because there is a genuine dispute going to whether Dr. Jackson exhibited deliberate indifference to plaintiff's broken jaw, the Court cannot grant summary judgment to Dr. Jackson on this count.

### 4. Dr. Jones

Plaintiff claims that Dr. Jones was deliberately indifferent to his broken and displaced jaw when he failed to ensure that plaintiff was timely treated. Dr. Jones responds that he misunderstood the treatment plan following plaintiff's appointment with Dr. Pernoud, but he essentially claims there was no harm because Dr. Pernoud had determined that no surgery should occur. Again, as reflected several times above, there is

a genuine dispute regarding the treatment plan as considered by Drs. Pernoud and Jackson.

Certainly, Dr. Jones could not perform the surgery plaintiff alleges he needed, but plaintiff contends that Dr. Jones should have done more to assure treatment. Plaintiff's medical record shows that Jones examined plaintiff several times after plaintiff's initial surgery. On August 27, Dr. Jones observed that plaintiff had removed his hardware and submitted a referral request to Dr. Jackson for plaintiff to be seen by an oral surgeon. On September 9, just two days after seeing Dr. Pernoud, Dr. Jones advised plaintiff that he would need a more complicated treatment and was waiting on a decision from Drs. Jackson and Pernoud. Dr. Jones prescribed liquid Motrin for pain in the meantime. Plaintiff next saw Dr. Jones on October 29, when Dr. Jones noted that he was still been waiting to hear from Drs. Jackson and Pernoud and that he planned to submit a referral request. Dr. Jones in fact submitted the referral request and spoke with Dr. Jackson on November 4. Dr. Jackson instructed Dr. Jones to speak with plaintiff and ask whether plaintiff wanted surgery. The medical record states that plaintiff wanted surgery later (plaintiff argues that he merely wanted a day to think about it), so Dr. Jones and Nurse Novak signed a Refusal of Treatment form over plaintiff's objection. Dr. Jones saw plaintiff again on December 3 and again submitted a referral request. When Dr. Pernoud declined to see plaintiff, Dr. Jones submitted another referral request, and plaintiff was ultimately seen by Dr. Richard Graham.

It is clear that, at each encounter with plaintiff, Dr. Jones acted to address plaintiff's concerns about his jaw.  With respect to the signing of the refusal form, such a refusal did not prevent plaintiff from deciding, later, to pursue further treatment.  The facts show that Dr. Jones was not deliberately indifferent to plaintiff's broken jaw complaints --- rather, Dr. Jones followed up on plaintiff's complaints, submitted a referral request when plaintiff removed his hardware, prescribed pain medication, and appropriately submitted referral requests when it became clear that no action had been taken after the September 7 visit with Dr. Pernoud.  Summary judgment will therefore be granted to Dr. Jones.

### 5.    Nurse Novak

As described above, Nurse Novak was involved in the process of requiring plaintiff to decide whether to have surgery or sign the refusal form.  Plaintiff contends that he wanted more time to decide and that because Dr. Jones and Novak signed the refusal over his objection, Novak contributed to the continued delay in his care.  Plaintiff states that defendant Novak was aware that he needed medical care, but she still signed the refusal form over his objection, which in essence caused another month's delay in being seen by a specialist.  Plaintiff argues that such conduct exhibits deliberate indifference.

Defendant Novak's involvement in the alleged deliberate indifference is limited to her signing the plaintiff's refusal form.  Plaintiff had the right to refuse medical treatment, and such a refusal did not preclude plaintiff from seeking treatment at a future

time.  Nurse Novak's preparation of plaintiff's refusal form (and her signing in his place) did not amount to deliberate indifference to a serious medical need.  Summary judgment will be granted to defendant Novak.

**B.      Count III:  Fourteenth Amendment Violations**

Plaintiff alleges that the defendants violated his due process rights as guaranteed by the Fourteenth Amendment when they prevented him from getting the surgery he says he needed to correct his jaw deformity.  Defendants contend that plaintiff cannot maintain a Fourteenth Amendment claim under these circumstances, as the Fourteenth Amendment covers cases brought by pretrial detainees --- not prisoners.  *See Hartsfield v. Colburn*, 371 F.3d 454, 456-57 (8th Cir. 2004).  Plaintiff insists that prisoners may bring claims under the Fourteenth Amendment for violations of substantive due process, *e.g.*, *Kulow v. Nix*, 28 F.3d 855, 858 (8th Cir. 1994).  However, "it is important to note the difference between constitutional claims arising under the Due Process Clause of the Fourteenth Amendment and those arising under a more specific provision of the Constitution, such as the Eighth Amendment."  *Mace v. Archer*, No. 2:14-CV-36-SPM, 2014 WL 2197756, at *3 (E.D. Mo. May 27, 2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989)).  As the Supreme Court has explained, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'"  *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotation and citation to *Graham*, 490 U.S. at 395, omitted).

Plaintiff's claim is best analyzed under the Eighth Amendment, which is already addressed by Count II. Count III will be dismissed.

### C. Counts VI and VII: Infliction of Emotional Distress

Next, Dr. Pernoud claims that he is entitled to summary judgment on plaintiff's claims for infliction of emotional distress. Under Missouri law, to recover for intentional infliction of emotional distress, a plaintiff must show (1) defendant's conduct was extreme and outrageous; (2) defendant acted in an intentional or reckless manner; and (3) defendant's actions caused plaintiff severe emotional distress that resulted in bodily harm. *St. Anthony's Medical Center v. H.S.H.*, 974 S.W.2d 606 (Mo.App.E.D. 1998). To recover for negligent infliction of emotional distress, a plaintiff must show that (1) a defendant should have realized that his or her conduct involved an unreasonable risk of causing distress; and (2) the distress or mental injury is medically diagnosable and sufficient enough to be medically significant. *Henson v. Greyhound Lines, Inc.*, 257 S.W.3d 627 (Mo. App. W.D. 2008).

Plaintiff has set forth evidence, by way of a declaration of a treating psychiatrist, that withholding the corrective jaw surgery caused plaintiff medically diagnosable emotional distress. Plaintiff has also set forth evidence that defendants, as medical professionals, would know that denying a patient necessary surgery, which results in a deformed and painful jaw, involves an unreasonable risk of causing distress. Plaintiff must show, however, for his intentional infliction of emotional distress claim that "the conduct must have been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community." *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997) (internal quotation omitted). In addition, the "conduct must be intended only to cause extreme emotional distress to the victim." *Id.* (internal quotation omitted). Plaintiff has not shown that the defendants intended only to cause his extreme emotional distress. The Court will thus grant summary judgment to defendants on the intentional infliction of emotional distress claim. However, plaintiff has shown that an issue of fact exists regarding whether the defendants were reckless in their failures to ensure plaintiff was treated promptly and appropriately. Thus, this Court cannot grant summary judgment to defendants on plaintiff's negligent infliction of emotional distress claims.

**IV.    Conclusion**

Summary judgment will be granted to all defendants as to Counts I and VI, and Count III will be dismissed.  Summary judgment will be granted to defendants Corizon, LLC, Jackson Institutional Dental Services, P.C., Rick Jones and Stephanie Novak. Remaining for trial in this matter are Counts II and VII for violation of plaintiff's Eighth Amendment rights and negligent infliction of emotional distress against defendants Jackson and Pernoud.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Gregory Pernoud, D.D.S.'s motion for summary judgment (#161) and defendants Corizon, LLC, and Jackson Institutional Dental Services, P.C., Dr. Ernest Jackson, Dr. Rick Jones, and Stephanie Novak's motion for summary judgment (#171) are **DENIED** in part and **GRANTED** in part:

- Count III is dismissed.

- Summary judgment is **GRANTED** to all defendants on Counts I and VI.

- Summary judgment is **GRANTED** to defendants Corizon, LLC, Jackson Institutional Dental Services, P.C., Rick Jones and Stephanie Novak as to all counts.

- Summary judgment is **DENIED** as to defendants Pernoud and Jackson as to Counts II and VII.

Dated this <u>2nd</u> day of June, 2015.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE